School District. We're ready to hear that matter. Good morning, Your Honors. May it please the Court, I would request that three minutes of the ten minutes. I cannot hear you. Just speak up. Three minutes of the ten minutes have been allotted. I'd ask to be reserved for rebuttal. May it please the Court. Good morning, Your Honors. My name is Tom Vertides, and I represent the Payne family in this matter. Your Honor, this is a case about negligence and retaliation. Dylan Payne was a seven-year-old that was at Artindale Elementary in Peninsula District. He was in the transition room and was placed in an isolation room without consent of his parents. What happened, Your Honors, was construction paper was placed over a window. The window was closed, and this child was put in against his parents' wishes. I think the rest of the facts are clear from the record. What the trial court, the district court, wrestled with was the cases of Witte v. Robb. These cases, as well as the Covington case and the other cases cited, really stress the fact-sensitive nature of these types of cases and whether the IDAA is applicable in this matter. Respectfully, it's not for the following three reasons, the first of which is Dylan Payne's – the actions that were instituted against Dylan Payne were characteristics of his disability and occurred because of his disability. These were punitive in nature, and they serve no legitimate educational purpose. What is clearly found in the record is that once the parents found out that this was occurring, that Dylan was – It's the way it was occurring. They agreed you could use this room. That's correct, Judge. It's the way it occurred. That's correct. What occurred, Your Honor, was that the parents in early September of the school year were told that the room would be used for positive reinforcement, there would be no door, the door would remain open, and it would be used as a cooling-off period. That wasn't the practice that was instituted. The teacher, Ms. Coy, who did not have proper credentials, and what the court should recognize, at 156, there's actually a letter from an aide that the district received showing the gross negligence that was going on in this room. It's a letter from Dina Wollman, stated that Ms. Coy was not following IEPs, which was just basically treating this classroom as a babysitting function and having really no legitimate educational purpose. What was occurring is Dylan had autism, and every time he would act up, he'd get punished. He'd be sent into this room, the door would be closed, construction paper would be placed, and what was occurring is this child was being left in this room for such a period of time that out of sheer fear, he would urinate upon himself and defecate upon himself. That's clear in the record. Your Honor, he was forced to clean his own defecation. That serves no legitimate educational purpose. It was done to punish him. It was done in a punitive fashion. And education. But your argument wasn't here. But later on, didn't they find that they dealt with the school, they found another place to put him for the next year with a teacher who was qualified, and they were satisfied with the treatment? That is very clear. And that teacher left. Right? And they homeschooled this child. So isn't there a possibility that they could have found some kind of help or answer by negotiating with the school instead of turning around and suing the court for damages? Your Honor, the Paines did that, actually. What occurred is he was at Artendale Elementary. The parents went through a mediation process. What you'll find in the record is that on April 26th of 2004, the Paines implemented an informal administrative policy. They met with the school. They decided that this wasn't the proper school. Ms. Coy was not the proper educator. He was transferred to Harbor Heights Elementary. He was given one-on-one with an autism specialist. He was given extended school year, which is called ESY. There was an attempt to actually go through an informal administrative process, and that was performed. Dylan left that school. It was a successful attempt. It was successful. And what has occurred now is Dylan is being homeschooled and is being successful. So very similar to the cases in Witte, what you have is this child is no longer at this school. This child is not making a claim for any type of remedy that's afforded under the IDEA. And commonsensically, we're sitting here now in 2008 on an issue that was in 2003. We're not asking for counseling services. The proof is really in the pleadings, Your Honor. There are no medical specials that are requested. There is no demand for counseling. This is a child, if you read the IEP, has very limited social, communicative, and cognitive abilities. Having a school counselor or some type of other type of counseling remedy is not really applicable. What the Paynes are seeking is accountability and compensatory damages for the tort that was caused upon him. Can I ask you a couple of questions on the facts? Of course. Is it disputed as to whether the door was locked? No, Your Honor. What the record shows is that the door had an automatic locking mechanism where you actually had to have your foot on a pedal to keep the door open. So it was open only from the outside. Correct, correct. There was a declaration from Ms. Karen Klemmer, who was a parent of one of the students in there, that said that she went in and throughout the entire school year there was construction paper on the door. And now when his mother agreed to the program in the beginning, what did she agree to? She agreed to the door being open, there being beanbags, and it being an area that with Dylan, if he got a little oversensitized and needed an area to cool off, it was going to be for positive reinforcement, an area where he could go and cool off. Is that in the agreement of that testimony? That's the testimony of Ms. Payne. Your Honor, what occurred is the IEP was actually signed on September 24th, which is a couple weeks into the school year. What you'll find from reviewing the record is that he was actually being placed in this room on September 11th, 17th, and 23rd, even before the IEP was signed. It is the Paynes' express contention, and it's in their deposition testimony, that they in no way wanted a punitive or punishing kind of effect. The other important aspect of the facts of this case, Your Honor, is that after the Paynes learned of Dylan being forced to clean up his own excrement and actually urinating in his own clothes and being forced to go through that, the parents were very upset, went into the school, demanded accountability, and what happened was additional retaliatory actions were placed against them. Ms. Payne actually has an independent cause of action in this matter for negligent infliction of emotional distress. What you'll find in the record is that Ms. Payne was very active with Dylan's schooling. After she started raising questions about what in the world are you doing to my son in here, Ms. Croy said, you can't come back into this classroom without checking in. I don't want you coming in here. That's in Ms. Payne's deposition testimony. I did, Your Honor. Let me ask you, how is the boy doing now? He's homeschooling and doing well. How old is he now? He was seven at the time, and we've added four years. Twelve? In that range, Your Honor. And I'll defer 30 more seconds to just finish the point, Your Honor. The important point in this case, Your Honor, is there's two other retaliatory effects that have happened here. The school has gone and affected the relationship that Dylan had with Phil Blackledge. He was Dylan's teacher. There's testimony in Carol McGilliard's declaration as well as Wendy Payne's deposition that Phil Blackledge, who was a teacher in the Tacoma School District, Sarah Drinkwater, and that school went out and called Tacoma and stopped that relationship from happening, actually stopped this child from receiving outside sources, as well as stopped Wendy Payne from going to the classroom. As well, there's a declaration from Joyce Sears, Dylan's own teacher, that said he was not allowed to go to general ed, art, P.E., music, the things he loved. Her declaration is found at 387 in the record. This is a very different case and a legitimate educational purpose. What happened is this child lost the ability to go out to the general ed classroom. He lost the ability to have that secondary contact with Phil Blackledge, and his mom had no ability to come in and see. It's a very different case, and it falls under Witte. Thank you, Your Honor. What about the immunity issue? Your Honor, Judge Leighton at the lower court did not address the immunity issue, but we feel that based upon the actions of Ms. Coy and the intentional and there's really no support under the color of law that there would be no defense of her immunity. Thank you for your time. I see I have one minute left on rebuttal. Thank you. May it please the Court, Mr. Petitus, please rely on the record for the facts of this case. Not everything that I just heard I think is supported by the record, most particularly whether Ms. Payne has asserted an independent emotional distress claim. The supplemental record that we supplied has the complaint, and there is no ---- I think he said she could have asserted one. He said she had an independent cause, not this case. So tell us what facts would you say differently? Well, as far as the parent being aware of whether the door was open, on page 208 of the record in her deposition, there's a note that went back and forth between the parent and the teacher dated October 1st, and she's aware that the door was being closed. In the note it says, Dylan went in the room and he was upset when the door was closed. She knew that the door was being closed. The most important thing to understand about this case, Your Honors, is that they're asking for damages for things that are routinely addressed through special education. In paragraph 5.11 of the complaint, page 6 S.E.R., they allege regressed communicative functions. That can be addressed through speech and language therapy. What damages could they get if they had proceeded through the school district? You mean in special education? What monetary damages could they obtain for whatever they're claiming? What could they have gotten? For damages? I don't think they get anything. Well, then they're not claiming monetary damages. In the complaint they're claiming monetary damages, Your Honor. All right, well, then the whole issue here is could they get monetary damages from the school district? If you say they couldn't, then you're in federal court. Yes. Your Honor, I'm understanding the issue to be that they needed to exhaust administrative remedies first. No, but if the administrative remedies give nothing, they don't need to exhaust them. Administrative remedies give plenty in this case, Your Honor. They would not give them money. But they would give them. . . He's out of the school. He's homeschooled. Why would they want anything from the school district? You can't take a kid out of school in order to get monetary damages. No, you can't, but you can take a kid out to be homeschooled, and then he doesn't have an interest in the school remedies. But the school remedies available are still things that. . . They don't want them. He's not there. They do want a private school placement. They've been asking for that. Well, but not in this case. This case, the only thing they could get once the kid was out of the school was money. Isn't that perfectly clear? It's clear to me. If you could tell me why it isn't, I'd be interested. Yes, Your Honor. Under the Katase case, all that has to exist in order for administrative remedies to need to be exhausted is a situation where IDEA can address the injuries to some degree. How could they address them? In this case, they're alleging regressed communicative functions. That's speech and language. All right, but he's not in a school. How does the school address that problem? Regressed communicative functions is something that can be addressed through special education services of speech and language. OT, occupational therapy, physical therapy deal with the sensory functions that they're alleging that the child has regressed. The academic prowess is something that can be addressed through compensatory education. The emotional trauma is something that can be addressed through counseling and a behavior specialist, and also the whole possible Are you saying that they can't avoid these administrative steps where they're offered these other educational benefits simply by pulling their child out of school? Yes, Your Honor. Yes, Your Honor. I believe that that's true, and that's something that was stated in the NB case from another circuit that's supported in the Rob case, quoted favorably in the Rob case. I kind of got the idea that what you were saying was if they'd follow the administrative remedies, that you had all these other beneficial programs to offer, you could have probably worked something out with them. There's a possibility of that. Is that what you're saying? That's partly what I'm saying. What they did is they What's the other part? The other part is they followed part of the administrative remedies, and on August 24, 2004, they resolved eight out of 13 educational issues. That's in the mediation agreement that is at 441 and 442. But they didn't resolve four of the educational issues, which is the communicative function regression, the sensory function regression, the academic prowess loss of that, and the emotional trauma. They should have gone on then to a due process hearing to resolve those things. The position, I think, of the school district and also, I think, of the courts is, in essence, that administrative remedies are a procedural right that school districts have in order to deal with situations such as this to give them an opportunity to correct a problem. We didn't have an opportunity to correct the problem with those four things that I just mentioned. They weren't raised at the mediation by the plaintiffs. They selectively dealt with eight things, withheld four things. They don't want them. All they want is some money to make up for the injuries inflicted on their child. Now, that's perfectly simple. I understand. Nothing they can get out of the school district. But they don't get money damages for injuries that happen to a child when the injuries that they're alleging are special education addressed. Of course they do, if they're taught. Now, we're not going to try it, whether it's a tort or not. But they have a chance to prove it. They may fail. But if it's a tort, it goes to a federal court. I agree, Your Honor, with that. And the Witt case is very clear on that. In that case, there was criminal misbehavior on the part of the teachers. Criminal? Were they tried criminally? Pardon me? They weren't tried criminally. They were not. It was just a couple of torts. But in that particular case, what they did was child abuse under Nevada revised code. I don't know how this would be characterized. I don't know. Well, under this situation that we're in, it's already characterized under Washington law as an educational strategy. I don't think locking a kid up in a small room for some time is necessarily educational. Well, Your Honor, I respect that. I mean, that's a subject that a jury can look at. We don't have to look at it. It's a subject that has already been looked at under law in Washington State under 392.172. Well, all right. If it's a matter of Washington law, that's the way it will go. Pardon me? If it is decided by Washington law, that's the way the trial will go. But it's not being we're not trying that. Anything that is done with a child in special education is because of his disability. That's what special education is all about. That was the argument. This is special education. But in the WIC case, it also is a violation in Nevada Revised Statute 432B.020, which prohibits child abuse. In this case, the law that applies allows what was being done, and that's Washington Administrative Code 392.172.394, subsection 1. Isolation rooms are allowed under law. So it's totally different from the WIC case. Is the isolation room described in the law? It has some descriptions in the law, yes, Your Honor. Is it a locked, dark room? Well, first of all, Your Honor, there's dispute as to whether this was a dark room. I know. That's the sort of thing that might go to trial. And no dispute it was locked. There is a description under Washington law in that code section. I can hand it to you when I leave the bench. First of all, the duration of use shall be provided for in the terms of the IEP program established in accordance with the requirements of an earlier code section. It's supposed to be lighted, ventilated, temperature controlled from the outside, and there has to be an adult within either eyesight or auditory range. Now, if it's locked, I mean, that's a factual thing that would have to be developed, whether Ms. Coy was in the auditory range or not. Yes, it is something that could be developed through the IDEA special education remedies. But it also could be developed in a federal court in a trial. But under the exhaustion of administrative remedies. But what if they're trying for money? Your Honor, they can't just ignore the special education remedies and then try for money. They don't have that choice. That's your position. That's all right. You've said it a number of times. Yes. Thank you, Your Honor. In conclusion, Your Honors, I believe that it's very clear in the Rob case and in the Witt case that when somebody is alleging injuries that are redressable by special education, they can't ignore special education administrative remedies. They have to go through those remedies first before they go to federal court. And in the Witt case, the difference between that case and this case was what was done in there was child abuse. What's done in here is something that is specifically allowed by Washington law. Thank you very much. All right. Your Honors, Washington law does not allow a teacher to place a child against their will into a locked, closed door that's covered with construction paper and leave them there so long that they urinate and defecate upon themselves. Your Honor, the common sense approach to this is we sit here fighting. How long was he in that room? Your Honor, we do not know. Under the WAC provisions, you're supposed to list how long the child's in there. They never put the time. But he was in there long enough to urinate upon himself and defecate upon him. That could happen immediately as soon as he went in. Theoretically, I guess so, Your Honor. It could. Not theoretically. It could. It could. The other point I wanted to raise is Ms. Payne has brought a negligent infliction of emotional stress claim. She's listed in the complaint individually, and at 6.2.7 of the complaint, her negligence claim is listed. So what we have here then is counsel wants us to go spend a year, year and a half, fighting in an administrative court to try to get a remedy that we don't need because he's being homeschooled and doing fine, and then we're going to come back in a year and a half and then bring Dylan's claim with Wendy's claim that's still sitting in the district court waiting. Is it true they're trying to get the district to pay for private school for this child? That's not correct, Your Honor. What happened in this matter, Your Honor, is there were settlement negotiations done and there was some kind of talk. The Paynes have just wanted the school district to be held accountable for this, and the only way that we can do that is money damages. Under the Covington and under the Witte analysis, that's the only commonsensical approach we have here. This is just an effort to waste time and money and resources and have the Paynes go through another loophole before effectively resolving this case. I want to thank the court for its time. All right. The matter is submitted. We'll go on to the next matter. Bennion v. United States, that's submitted. And Miller v. Verizon Long-Term Disability Plan, that's submitted. And now we come to U.S. v. Rita Johnson.
judges: Pregerson, Hall, Noonan